# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

TIMOTHY DAMIEN BRADLEY,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 BE 0003

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 22 CR 88

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Jacob A. Manning,* Assistant Prosecuting Attorney for Plaintiff-Appellee and

*Atty. Joseph F. Salzgeber*, and *Atty. Aaron J. Brockler*, for Defendant-Appellant.

Dated:  October 30, 2024

**Robb, P.J.**

{¶1} Appellant, Timothy Damien Bradley, appeals three judgments issued by the Belmont County Court of Common Pleas: the February 22, 2024 judgment denying Appellant's post-verdict motion for acquittal; the February 22, 2024 judgment overruling his motion for a new trial; and the February 28, 2024 judgment convicting him of two counts of discharging a firearm into a habitation and sentencing him up to nine years in prison.

{¶2} Appellant argues the jury's verdict is based on insufficient evidence and is against the manifest weight of the evidence. He also contends the trial court committed plain error by failing to instruct the jury on the doctrine of transferred self defense and the jury's verdicts are arbitrarily and irrationally inconsistent. Last, Appellant asserts the trial court erred by imposing more than the minimum sentence.

{¶3} For the following reasons, Appellant's first assigned error has merit in part. Appellant's conviction on count two for improperly discharging a firearm into a habitation with a gun specification was supported by sufficient evidence. However, Appellant's conviction on count three, improperly discharging a firearm into a habitation and the attendant firearm specification, was not supported by sufficient evidence.

{¶4} Further, Appellant's assigned error contending plain error has merit. Thus, we reverse and remand for a new trial on count two, pertaining to the house owned by Jessi House, but not on count three.

<u>Statement of the Facts and Case</u>

{¶5} Appellant was indicted in April of 2022 and charged with three, second-degree felonies: one count of felonious assault in violation of R.C. 2903.11(A)(2), and two counts of discharging a firearm into an occupied structure in violation of R.C. 2923.161(A)(1). Appellant was subsequently charged by a superseding indictment of the same three offenses. In addition, a three-year firearm specification pursuant to R.C. 2941.145 was added to each of the three felony charges. (October 5, 2023 Superseding Indictment.)

{¶6} The June 15, 2022 Bill of Particulars states count two, the first improperly discharging a firearm count, concerned a shooting at or into the habitation located at 625

<u>Case No. 24 BE 0003</u>

Washington Street. As for count three, the bill of particulars indicates that Appellant knowingly discharged a firearm at or into the habitation located at 623 Washington Street. (June 15, 2022 Bill of Particulars.) There is no updated bill of particulars of record after the superseding indictment.

{¶7} The parties exchanged discovery and the court initially set the case for trial in November of 2022. The trial date was continued several times. The court denied Appellant's sixth request for a continuance.

{¶8} Appellant filed a notice of self defense in October of 2023. Defense counsel moved the court to hold a hearing on self-defense issues and jury instructions, which was granted and held December 18, 2023.

{¶9} The jury trial commenced December 27, 2023. The state's first witness was Zachary Burch, who was 24 years old at the time of trial. Burch's employer performed home construction and remodeling as a subcontractor for Lowe's. (Trial Tr. 277-284.)

{¶10} Burch met Appellant while installing flooring in one of Appellant's homes in this capacity. Appellant asked Burch and his friend Treyton to perform "side jobs" for Appellant on the weekends. Thereafter, Burch and Treyton worked for Appellant on the weekends. Burch performed his other job on week days. Burch said he and Appellant were both "gun enthusiasts," and Appellant showed him his gun collection. Burch thought he and Appellant were friends. They texted one another and shared nonwork-related information in their messages. (Trial Tr. 285-290; 329.)

{¶11} On the day of the shooting, Burch went to Appellant's house to work but forgot his keys. Because he could not get ahold of Appellant, Burch said he returned home and went back to sleep. Burch woke up to texts from Appellant stating he was fired. So Burch said he had to go and get his tools from Appellant's house. It was Memorial Day. (Trial Tr. 295-297.)

{¶12} When he arrived at Appellant's house, the front door was open. Burch retrieved his air compressor from Appellant's house and took it to his car. When Burch went back to get the rest of his tools, he said Appellant "opened fire on me." Burch denied pulling a gun on Appellant. Burch also denied "going for his gun" because he said he did not have time. But Burch said he "always" has his gun on him. He said he "open carries" and wears his gun in a bellyband holster. (Trial Tr. 346-358.)

Case No. 24 BE 0003

{¶13} After he was shot, Burch said he ran to his car to get his phone. He said he never took his gun out of the holster. He recalled Appellant chased him out of the house. Burch dropped the holster and gun in his car, grabbed his phone, and ran to a neighbor's house. The neighbor did not allow Burch to enter his home. (Trial Tr. 362-365.)

{¶14} Before Burch was shot, he said Appellant was following him around and Burch told him to "quit fucking with me," meaning leave him alone. Burch was shot multiple times and once in the lung. He was life-flighted to a hospital in Morgantown, West Virginia. He said the pain from his gunshot wounds is permanent and continues to bother him. He has nerve damage. Burch said his chest and armpit are numb. (Trial Tr. 390-396.)

{¶15} On cross-examination, Burch denied that his co-worker and friend Treyton used drugs. Burch also denied Appellant had previously fired them both. Instead, Burch said Treyton quit to go to barber school. Burch also denied being a violent person, but he did admit to beating up his brother. Burch denied ever pulling a gun on a former boss. Burch explained he open carries his gun, meaning the gun must be visible to others. Whereas, Appellant had a concealed carry license. (Trial Tr. 412-421.)

{¶16} Burch also denied he was braking hard or speeding upon his arrival at Appellant's house that day. He denied being "pissed off" but then agreed he told police he was "pissed off." Burch said his story had discrepancies because he had been shot five times and was on several pain medications.

{¶17} Burch denied Appellant warned him not to enter his home with a gun. Burch denied threatening Appellant, but then agreed after listening to an audio recording that he said, "Don't even fuck with me. . . . I'll burn it down, brother." After hearing the audio, Burch conceded, "I guess I did threaten him." In the recording, Burch can be seen carrying the air compressor from Appellant's home. He can be heard saying "I'll burn it down, brother" and "Don't fuck with me . . . Do not fuck with me. I'm telling you now, you've fucked with the wrong one of them." He also says something about his "fucking money." The audio and video were obtained from a security camera from a house across the street. (Defense Ex. B.)

{¶18} The video shows that as Burch entered Appellant's house a second time, he was likely still wearing the gun in the bellyband holster. The inside of Appellant's

house appears dark, but it was light and daytime outside at the time of the shooting. The video is less than clear, but it does not look like Burch is holding a gun in his hand when entering the house either time. Once Burch passed the threshold a second time through an open door, shots can be seen and heard on the recording. It does not appear Burch reached for his gun until he turned away and after the shots were fired. Appellant fired six shots. (Defense Ex. B.)

{¶19} Burch said he did not have time to "draw on" Appellant. Burch denied ever pulling his gun. (Trial Tr. 448.)

{¶20} Burch was shot several times. He testified two of the bullets went through him and left exit wounds. (Trial Tr. 362-363, 370-371; State's Ex. 21.)

{¶21} Jessi House testified for the state. At the time of the shooting, she lived directly across the street from Appellant's house on Washington Street with her son. Her address was 625 Washington Street. She is a nurse. She woke on the day of the incident to gunshots. She looked out her bedroom window and saw Appellant coming out of his doorway and a second man was running away. She said she exited her home to render aid to Burch.

{¶22} House went outside and saw Appellant with a gun. She said she "threw her hands up" and looked at Appellant. She heard Appellant state "he threatened." Days later, she realized she had property damage inside and out. A bullet had grazed a baseboard inside her home and was found in her dining room inside a box fan. Another bullet was found behind her couch. There were two bullet holes in the front door of her home.

{¶23} On cross-examination, House testified she is not sure whether Burch had a gun at the time of the shooting. She said Appellant was a nice neighbor, and she did not perceive him as a threat even though he had just shot a man. (Trial Tr. 505-508.)

{¶24} Timothy Andrew Starkey of the Martins Ferry Police Department testified he secured the neighbor's video footage. When Starkey arrived at the scene, the EMTs were already there. Starkey assisted in Appellant's arrest. He confirmed the house across the street from Appellant's, 623 Washington Street, had two bullets lodged in the siding. This house was located next door to the one owned by Jessi House. The owner or occupant of the 623 Washington Street home was not identified during trial and did not testify.

Case No. 24 BE 0003

**{¶25}** On cross-examination, Starkey testified Appellant can be heard in his recorded interview stating Appellant put Burch's gun back in the bellyband. Appellant also stated all shots were fired inside his house.

**{¶26}** Starkey explained the police did not believe Burch pulled a gun on Appellant before Appellant shot him. Starkey confirmed the bullets were not tested. No one knows if bullets that hit the houses passed through Burch first. (Trial Tr. 552-556.)

**{¶27}** Sergeant Vernon Trigg III, of the Martins Ferry Police Department, testified for the state. Trigg said Appellant told police Burch pointed a gun at him; however, Trigg said this is not visible in the video recording. Trigg agreed, however, the video does not depict activities inside Appellant's house. (Trial Tr. 564-581.)

**{¶28}** Trigg also testified Burch provided a handwritten statement, but no one knows where this statement is or where it went. He also stated no one knows for sure if Burch ran away while holding a gun and the police did not believe Appellant. (Trial Tr. 589-596.)

**{¶29}** The state rested, and the court denied Appellant's motion for acquittal.

**{¶30}** The defense case in chief began with the testimony of Sherri Vargo. She owned the house next to Appellant's at the time of the shooting. She was on her couch when she heard arguing and then gunshots. She looked out her window and saw a white male running from Appellant's porch. She said the man running away had a gun in his right hand. She said Appellant was yelling "I want my stuff back." She watched the man run to a neighbor's porch. Vargo stated Appellant did not shoot his gun while outside of his house. (Trial Tr. 624-629.)

**{¶31}** Appellant testified on his own behalf. He explained he is an NRA firearms instructor and has taught in Hawaii and Arizona. He teaches the principles of self defense, but explained it varies by state. He is also a mechanic. Appellant moved to Martins Ferry from Honolulu. He came to Ohio to pick up a truck he purchased. He purchased two houses in Martins Ferry to renovate. Both homes had garages to store his vehicles. (Trial Tr. 670-678.)

**{¶32}** Appellant had a difficult time finding contractors to help him. He met Burch and his friend Treyton, who worked as Lowe's subcontractors. They did good work, so

Appellant hired them to do a few "side jobs." Appellant recalled they "smelled like weed all of the time," but he said it did not seem to affect their performance.

{¶33} Appellant explained, however, that one day Treyton "changed a price on him" meaning he asked for more money than they had agreed. Appellant also said Treyton became very aggressive. Appellant paid them, sent them away, and did not use them again. (Trial Tr. 684-687.)

{¶34} About a month or so later, Burch called Appellant to see if he still needed help. Burch began working for Appellant without Treyton. Appellant paid Burch via CashApp. One time Appellant caught Burch urinating in his sink, which upset Appellant. Appellant said he offered to give Burch a truck in exchange for doing certain work for the next house Appellant was going to purchase. (Trial Tr. 687-692.)

{¶35} Appellant said he never saw Burch with a gun before the date of the shooting. The two men previously had several minor arguments, but Appellant recalled having a big one the night before the shooting. Appellant recalled Burch was irate, loud, and was shaking his finger in Appellant's face. He said Burch was aware he owned guns and was a firearms instructor. (Trial Tr. 693-698.)

{¶36} Appellant explained how Burch told him a story about how on one occasion, Burch pointed a gun at his brother's head and threatened him because the brother owed Burch money. The story made Appellant believe Burch was unstable. Another time, Burch told Appellant about pointing a gun at a former boss's head and saying the man "shit his pants," and Burch jumped out of his truck. Burch told Appellant this story after Appellant criticized some of Burch's work. Appellant took the story as a threat and planned to end his relationship with Burch after the two bathrooms were completed. (Trial Tr. 699-701.)

{¶37} The day of the shooting was May 31, 2021. It was Memorial Day. Appellant recalled Burch was not at the house that morning when he was supposed to be there to help Appellant change a vanity. Appellant decided to fire Burch since he did not appear that day and had shown erratic behavior. Burch got mad easily and was irritable.

{¶38} When Burch arrived at Appellant's home after being fired via text message, Appellant said he was not going to pay Burch $1,300. Burch had not finished the work and had not earned the full amount. Appellant said he was on the front porch when Burch

Case No. 24 BE 0003

pulled up in his car and slammed on the brakes. Burch was coming to get his tools and was yelling "Where's my $1,300?" Burch was wearing a visible gun in a bellyband higher up around his chest, which is not typically how a bellyband is worn. (Trial Tr. 701-707.)

{¶39} Burch entered Appellant's house the first time and Appellant said he advised him to leave his gun in the car and said, "Don't come in the house with that gun." Burch was angry and told Appellant "Fuck you" and said something like "this is Ohio," which permits open carry. Burch carried an air compressor to his car. According to Appellant, Burch ignored Appellant's directive about leaving the gun in the car and returned with his gun to get the rest of his tools. (Trial Tr. 708.)

{¶40} Video from the neighbor's security footage was played in which both Appellant and Burch can be seen and heard before, during, and after the shooting. After playing part of the video, Appellant testified Burch could be heard saying: "Don't fuck with me, dude. Don't fuck with me. I'll fuck you up; I told you what I did to my brother. I don't give a shit if you're Hawaiian or not." He said something like "I'll shoot this bitch up," or "I'll burn this house up." (Trial Tr. 717; Defendant's Ex. B.)

{¶41} Appellant agrees he left the front door completely open after Burch carried out the air compressor. Appellant thought the altercation was over, so Appellant went to the back of the house to turn off the breaker, when Burch came up the front steps a second time. Burch was still outside the house and could be heard on the video, which was resumed during Appellant's testimony saying: "If you don't give me my fucking money, I'm going to shoot this house up." As Burch entered the house, Appellant saw him move his arm up toward the gun "like he was going to draw on me." So Appellant explained he "drew and fired." He fired approximately six shots and Appellant stopped shooting as Burch ran from the house. Appellant followed him outside and saw Burch jumping and screaming with a gun in his hand. (Trial Tr. 720-731.)

{¶42} Appellant explained how on the day of the incident, he believed Burch actually drew his weapon. However, Appellant acknowledged after watching the video Burch did not draw his gun before Appellant fired the shots.

{¶43} Appellant followed Burch until he dropped his gun into his car. Burch then ran to a neighbor's porch. Appellant testified he put Burch's gun back in the holster and

carried it to his front porch. Appellant was afraid of Burch. He said Burch's behavior scared him and he felt Burch was a lethal threat that day. (Trial Tr. 734-738.)

**{¶44}** On cross-examination, Appellant said on the date of the incident he thought Burch had pulled a gun on him after "barging into his house." Yet Appellant also agreed he told Burch to come and get his tools and he left his front door wide open. (Trial Tr. 740-762.)

**{¶45}** Defendant's Exhibits A and B are body camera recordings of the police interview of Burch taken on the day after the shooting while he was hospitalized. Burch stated in part he had his gun on him upon arriving, but took his gun off because "it was too heavy." He said he did not have it on his person the second time he entered Appellant's house that day.

**{¶46}** Burch denied seeing a gun on Appellant. Burch also denied making threats to Appellant and denied Appellant told him not to come back into the home. Burch also said Appellant did not make verbal threats to him either. Burch said this time, Appellant did not want to pay him, but Appellant did not state why.

**{¶47}** Describing his wounds, Burch said he was shot three times. Two shots went straight through and one fragmented. When asked why Appellant shot him, Burch indicated: "maybe because he probably thought I was gonna do something." (Defendant's Exhibits A & B.)

**{¶48}** The self-defense instruction given during trial was:

Self-defense: The defendant claims to have acted in self-defense to all three (3) of these charges. The defendant is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense. The defendant is presumed to have acted in self-defense when this occurred in his residence.

The State's proof: To prove that the defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:

The defendant was at fault in creating the situation giving rise to the shooting of Zachary Burch; or, the defendant did not have reasonable

grounds to believe that he was in imminent danger of death or great bodily harm; or, the defendant did not have an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm; or, the defendant used unreasonable force.

(Trial Tr. 922, 925-926.)

**{¶49}** In closing, the state argued Burch was ambushed.

**{¶50}** The defense urged the jurors to conclude Burch was not a credible witness in light of his statements that were contradicted by video. At one point Burch claimed he had placed his gun in his car before the shooting since the tools were too heavy. The defense argued in part "if you believe Appellant shot at Burch in self defense, then the shooting into the neighbors' dwellings was privileged." (Trial Tr. 944-954.) There was no corresponding jury instruction in this regard.

**{¶51}** Appellant was found guilty of the two counts of discharging a firearm at or into a habitation and the attendant firearm specifications. He was found not guilty of the felonious assault charge. (January 2, 2024 Judgment.)

**{¶52}** After the jury's verdict was announced, Appellant moved for a mistrial contending the use of self defense was a privilege and precluded the findings of guilt on the two, shooting into a habitation charges. (Trial Tr. 995-996.)

**{¶53}** The trial court ordered a presentence investigation report and scheduled the case for sentencing.

**{¶54}** Appellant filed three post-trial motions: he moved for a mistrial, asked for a new trial, and moved to dismiss the gun specifications on speedy trial grounds.

**{¶55}** At a February 7, 2024 hearing, Appellant argued the merits of his motion for acquittal and for a new trial, which the state opposed. Appellant orally moved to dismiss his firearm specification argument at the hearing.

**{¶56}** Appellant's post-trial motion for acquittal argued the jury's split in the verdict showed there was insufficient evidence for the discharging a firearm charges into a habitation since there was no evidence for the "knowingly" and "without privilege to do so" elements. Counsel argued it was undisputed the shots were fired from inside his home and directed at Burch. The video evidence supports this as well as testimony. There was no evidence as to whether the bullets striking the neighbors' houses were the same ones

Case No. 24 BE 0003

that went through Burch or different ones. Additionally, Appellant argued testimony from the neighbors, to the effect that Appellant was not permitted to shoot at or into their homes, was required. Further, Appellant argued because his shooting was in self defense, it was privileged under the law. (January 29, 2024 Tr.)

{¶57} Appellant argued in his motion for a new trial that the inconsistent verdicts were arbitrary and irrational; the trial court erred by failing to give the stipulated jury instruction concerning self defense after each count of the indictment. The defense likewise argued the privilege of self defense is encompassed by the statutory definition of privilege under R.C. 2901.01(A)(12). Appellant urged the court to follow the decision in *State v. Randolph*, 794 F.3d 602 (6th Dist. 2006). Whereas the state urged the court to overrule Appellant's motions and proceed to sentencing. The court reinstated Appellant's bond pending sentencing. (January 29, 2024 Tr.)

{¶58} The trial court overruled Appellant's post-trial motions. It concluded there was sufficient evidence to convict him and Appellant's inconsistent verdict argument lacked merit. The trial court noted, "a Defendant cannot argue insufficient evidence based upon the Jury finding him not guilty on Count One. . . . Count One was not even a predicate offense of Counts Two and Three." As for Appellant's argument about the self-defense jury instruction, the court pointed out the instruction stated: "Defendant claims to have acted in self-defense to these three (3) charges." (February 22, 2024 Judgment.)

{¶59} At the sentencing hearing, the defense urged the imposition of a minimum sentence of five years. Appellant's PSI showed no criminal record. Appellant spoke on his own behalf. He informed the court how he apologized to the one neighbor and offered to pay for the repairs. Appellant stated the other neighbor is still unknown. There was no claim for restitution from either homeowner. The trial court, after explaining its point of view, noted Burch in this case was armed and making threats, but he was invited into the home and entered through a door that was open. The court also stated: "As soon as the gentleman entered your doorway, you fired six times." The court said Appellant "deflected" responsibility for his conduct.

{¶60} Appellant was sentenced to two, three-year prison terms for the firearm specifications and two, four-year sentences for the underlying offenses to be served

concurrently. The court ordered Appellant to serve a minimum of seven years in prison and a maximum of nine years. (February 28, 2024 Sentencing Judgment.)

**{¶61}** Appellant raises five assignments of error.

<u>Sufficiency of the Evidence</u>

**{¶62}** Appellant's first assignment of error contends:

"The evidence presented by the State of Ohio at Defendant-Appellant's jury trial was insufficient to support the verdicts of 'guilty' as to Counts II and III, the charged offenses of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), where the essential elements of 'knowingly' and 'without privilege to do so' were not proven beyond a reasonable doubt as to those charged offenses."

**{¶63}** Whether evidence is legally sufficient to sustain a verdict is a question of law, which appellate courts review de novo. *State v. Thompkins*, 78 Ohio St.3d 380 (1997); *In re J.V.*, 2012-Ohio-4961, ¶ 3. A challenge on sufficiency grounds involves the state's burden of production rather than its burden of persuasion. *Thompkins*, *supra*, at 549 (Cook, J., concurring).

**{¶64}** On appeal, we determine whether the evidence presented, viewed in a light most favorable to the prosecution, allows a rational trier of fact to find the essential elements of the crime established beyond a reasonable doubt. *State v. Dent*, 2020-Ohio-6670, ¶ 15. We must view the evidence and all reasonable inferences in favor of the state. *State v. Goff*, 1998-Ohio-369 (1998).

**{¶65}** Appellant was convicted of two counts of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), which states: "No person, without privilege to do so, shall knowingly . . . [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."

**{¶66}** Thus, the state was required to establish that Appellant: 1) without privilege to do so, 2) knowingly, 3) discharged a firearm, 3) at or into a permanent or temporary habitation. The state bears the burden of establishing all material elements of a criminal offense with proof beyond a reasonable doubt. *State v. Adams*, 62 Ohio St.2d 151, 153 (1980).

**{¶67}** Here, Appellant only challenges the "knowingly" and "without privilege to do so" elements, and as such, we do not analyze the other elements.[1] Knowingly is defined in R.C. 2901.22(B), which states in part:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist.

**{¶68}** As the state argues, the evidence shows Appellant acted knowingly with regard to both counts. Appellant fired a handgun six times at an individual standing in the threshold of his front door when the front door was open. The close proximity of the houses on the street was apparent in the photos, and as a firearms instructor, Appellant was aware that firing a gun in such close proximity would probably result in a bullet leaving his property and striking a neighbor's house. Further, the state offered evidence showing bullet holes were found in the siding of one home and two bullets were found inside the home of Mrs. House. We conclude this element was established for both counts, and this aspect of his argument lacks merit.

**{¶69}** As for the element of "without privilege to do so," Appellant urges us to find the state has a burden to prove a defendant's lack of privilege as an essential element of the offense. He contends that since the language "without privilege to do so" is encompassed in the criminal statute, it is not an affirmative defense, but an essential element to be proven by the state. We agree.

**{¶70}** The state has the burden of establishing all material elements of a crime by proof beyond a reasonable doubt. *State v. Adams*, 62 Ohio St.2d 151, 153 (1980); R.C. 2901.05(A). "'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." R.C. 2901.05(E).

**{¶71}** Furthermore, "the general rules of statutory construction require a criminal statute to be strictly construed against the state and liberally construed in favor of the

---

[1] Under R.C. 2909.01(C), an "occupied structure" is defined as including a "temporarily unoccupied" "permanent or temporary dwelling."

Case No. 24 BE 0003

accused." *State v. Richard*, 129 Ohio App.3d 556, 560 (7th Dist.1998), citing *State v. Conley*, 147 Ohio St. 351, 353 (1947).

**{¶72}** The court did not define the phrase "without privilege to do so" for the jury. And neither party directs our attention to a case addressing the phrase or element "without privilege to do so" in connection with the statute charged here. The trial court did define the term privilege for the jury, stating: "Privilege: That's an immunity, license or right conferred by law, bestowed by express or implicit grant, arising out of status, position, office or relationship, and growing out of necessity." (Trial Tr. 922.)

**{¶73}** Appellant directs this court to cases analyzing trespassing statutes to support his argument that a defendant's lack of privilege is an essential element of the offense, and not an affirmative defense, since it is encompassed in the criminal statute. In *Columbus v. Parks*, 2011-Ohio-2164, ¶ 13 (10th Dist.), the Tenth District Court of Appeals held:

> A defendant's lack of privilege to be lawfully present on the property is an essential element of criminal trespass; privilege is not an affirmative defense that a defendant must prove. *Columbus v. Andrews* (Feb. 27, 1992), 10th Dist. No. 91AP-590. Thus, to sustain a conviction for trespass, the city must prove that the defendant lacked privilege to enter or remain on the premises. *Id.; State v. Hites,* 3d Dist. No. 1-2000-22, 2000-Ohio-1695, citing *State v. Newell* (1994), 93 Ohio App.3d 609, 611, 639 N.E.2d 513.

"[T]he concept of privilege has been broadly construed, and the state has been required to prove lack of privilege." *State v. Shelton*, 63 Ohio App.3d 137, 140 (4th Dist.1989), citing *Mariemont v. Wells*, 33 Ohio Misc.2d 9 (1986); *State v. Hohman*, 14 Ohio App.3d 142 (12th Dist. 1983); and *State v. Herder*, 65 Ohio App.2d 70 (10th Dist. 1979).

**{¶74}** In *State v. Hohman,* the court of appeals held in part that the state failed to show by proof beyond a reasonable doubt that the defendant was without privilege to be on the premises since he had been invited by certain nursing home residents. *Id.* at 164.

**{¶75}** In *State v. Steele*, 2013-Ohio-2470, ¶ 26, the Ohio Supreme Court analyzed the phrase "without privilege to do so" as it is included in R.C. 2905.02, defining the offense of abduction. While it was not an issue on appeal, the Supreme Court nevertheless noted in part: "[I]n order to convict a defendant for the offense of abduction,

the finder of fact must determine that the defendant removed and/or restrained the victim by force or threat 'without privilege to do so.' R.C. 2905.02(A)." *Id.* Some of the issues before the court were whether the court gave proper instructions to the jury; the definition of the word "privilege;" and whether a police officer lost his privilege. *Id.* at ¶ 30-31.

**{¶76}** The state, on the other hand, urges us to consider the phrase "without privilege to do so" an affirmative defense. The state directs our attention to a decision by the Second District Court of Appeals, which addressed this language in the context of analyzing R.C. 2921.31(A), defining the offense of obstructing official business. In *State v. Fader*, 2018-Ohio-4139, ¶ 15 (2d Dist.), the Second District explained:

> [I]n regard to the issue of "privilege" under R.C. 2921.31(A), other appellate courts have held that the absence of privilege is not an essential element of obstructing official business which the State must prove beyond a reasonable doubt. *State v. Elkins*, 5th Dist. Richland No. 17 CA 59, 2018-Ohio-1267, ¶ 20. Rather, "privilege is more of an affirmative defense or a mitigating circumstance that if shown to exist would prevent an accused from being convicted of obstructing official business." *State v. Gordon*, 9 Ohio App.3d 184, 187, 458 N.E.2d 1277 (1983). In the instant case, however, the record establishes that the trial court instructed the jury that privilege, or the absence thereof, was an element of the offense of obstructing official business which had to be proven beyond a reasonable doubt.

**{¶77}** We disagree with the foregoing. Criminal statutes must be construed in favor of the accused. The phrase "without privilege to do so" is included in the text of the statute as an element of the offense. Contrary to the state's argument, we conclude the legislature's decision to include the words "without the privilege to do so" makes this an element of the offense with the burden on the state. Therefore, the state had the burden to prove Appellant lacked privilege to shoot at or into the neighbors' dwellings.

**{¶78}** Regardless, the state urges us to conclude the jury could infer a lack of privilege from evidence other than explicit testimony demonstrating a lack of privilege or permission. We agree in part.

{¶79} The state directs our attention to the testimony of Jessi House. House testified she is the owner of 625 Washington Street. Her home was struck by bullets on the date of the incident.

{¶80} She was not asked if Appellant had permission to shoot at or into her home. She was also not asked if she understood Appellant was shooting in self defense or whether she would have given him permission. Notwithstanding, the jury could infer from her testimony that she did not give him permission to shoot at or into her home.

{¶81} House described being awoken and startled by the sounds of gunshots. House acknowledged she exited her home and "threw her hands up" toward Appellant, which tends to show she was upset about the gunshots and did not approve of bullets entering her home or landing in her dining room. Thus, there was sufficient evidence to sustain this element for the charge pertaining to her home, i.e., 625 Washington Street, count two.

{¶82} However, the second charged offense of discharging a firearm into a habitation, count three of the indictment, was charged in connection with the bullets found in the siding of the home next to Jessi House's residence. The owner or occupant of the home located at 623 Washington Street did not testify. Officers confirmed two bullets were found in the siding of this home. However, no one testified Appellant lacked privilege or permission to shoot at this home. There is no evidence in the record showing who the owner was, let alone whether he/she granted Appellant permission to shoot at the house.

{¶83} Absent evidence, any finding is pure speculation and erroneous. "Criminal convictions cannot rest upon mere speculation; the state must establish the guilt of the accused by proof beyond a reasonable doubt." *State v. Pankey*, 2008-Ohio-3091, ¶ 40-41 (7th Dist.), quoting *State v. Haynes*, 25 Ohio St.2d 264, 270 (1971).

{¶84} Arguably, no one would want damage to their home or the danger of shots being fired in their neighborhood. Yet there was insufficient evidence to make an inference in this regard for 623 Washington Street. Thus, the state failed to establish the element of "without privilege to do so" for count three concerning the bullets embedded in the siding of the home located at 623 Washington Street.

{¶85} Although not raised as an error, this court notes the state failed to establish the bullets striking the 623 Washington Street home were from Appellant's gun.

Case No. 24 BE 0003

**{¶86}** Appellant's first assigned error has merit in part. We reverse Appellant's conviction on count three, improperly discharging a firearm into a habitation and the attendant firearm specification, as not supported by sufficient evidence.

**{¶87}** Additionally, Appellant raises arguments under this assigned error about "lack of privilege" in light of the jury's verdict finding him not guilty of the felonious assault charge. He contends the jury found he was acting in self defense and since there was no DNA analysis or analysis of the trajectory of the bullets, this demonstrates the bullets he shot in self defense were privileged, such that the state failed to show he was not without privilege when his bullets entered the neighbors' homes. Because this argument is more properly addressed in connection with Appellant's third assignment of error about jury instructions, we address it there.

Manifest Weight of the Evidence

**{¶88}** Appellant's second assigned error asserts:

"The jury verdicts of 'guilty' as to Counts II and III, the charged offenses of discharging a firearm at or into a habitation, were against the manifest weight of the evidence, where the essential elements of 'knowingly' and 'without privilege to do so' were not proven beyond a reasonable doubt and where the jury found Defendant-Appellant 'not guilty' as to Count I, felonious assault, based on the privilege of self-defense for the exact same course of conduct in discharging his firearm inside his own house at an armed intruder therein."

**{¶89}** A manifest weight review requires us to review the evidence and determine whether this is an exceptional case in which it is patently apparent that the jury lost its way. *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). The reversal of a jury's verdict on manifest weight grounds requires a unanimous concurrence of all three judges. *Id.*

> The . . . weight of the evidence addresses the evidence's effect of inducing belief. . . . In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? . . . [A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. . . . 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror"

and disagrees with the factfinder's resolution of the conflicting testimony.' . . .

*State v. Wilson*, 2007-Ohio-2202, ¶ 25.

**{¶90}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "A jury is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis,* 2013-Ohio-1184, ¶ 18 (8th Dist.), citing *Iler v. Wright,* 2002-Ohio-4279, ¶ 25 (8th Dist.).

**{¶91}** Under this assignment, Appellant repeats his arguments raised in his first assigned error. He claims his convictions in violation of R.C. 2923.161(A)(1) are against the manifest weight of the evidence since the state failed to establish the elements of "knowingly" and "without privilege to do so." He claims an independent weighing of the evidence should result in the reversal of both counts.

**{¶92}** As detailed under his first assigned error, count two was supported by sufficient evidence, whereas count three was not supported by sufficient evidence as to each element. Because these arguments address the sufficiency of the evidence, not the weight, this assigned error lacks merit.

Plain Error Jury Instructions

**{¶93}** Appellant's third assigned error asserts:

"The trial court committed plain error by failing to instruct the jury on the doctrine of 'transferred self-defense' as articulated in *State v. Clifton* (1st Dist. 1972), 32 Ohio App.2d 284, which allows for acquittal where the defendant, while using deadly force by discharging a firearm in self-defense against one person, unintentionally killed another or caused damage to other person's property."

**{¶94}** Appellant urges us to find plain error in light of the trial court's failure to instruct the jury about the doctrine of transferred self defense. Because Appellant failed to raise this jury instruction issue to the trial court, he has waived all but plain error. *State v. Barnes*, 94 Ohio St.3d 21, 27 (failure to raise or object to jury instruction waives all but plain error).

**{¶95}** Crim.R. 30(A) states "a party may not assign as error [on appeal] the giving or the failure to give any instructions unless the party objects before the jury retires to

consider its verdict . . . " However, appellate courts may notice "[p]lain errors or defects affecting substantial rights . . . although they were not brought to the attention of the [trial] court." Crim.R. 52(B).

**{¶96}** "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶97}** Plain error is an obvious deviation from a legal rule that affects the outcome of the trial. *State v. Barnes*, *supra*. The appellant must show the outcome would have been different absent the plain error. *Id.; State v. Whitaker*, 2022-Ohio-2840.

**{¶98}** As stated, the trial court here gave the self-defense instruction during trial, stating:

> Self-defense: The defendant claims to have acted in self-defense to all three (3) of these charges. The defendant is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense. The defendant is presumed to have acted in self-defense when this occurred in his residence.
>
> The State's proof: To prove that the defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:
>
> The defendant was at fault in creating the situation giving rise to the shooting of Zachary Burch; or, the defendant did not have reasonable grounds to believe that he was in imminent danger of death or great bodily harm; or, the defendant did not have an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm; or, the defendant used unreasonable force.

(Trial Tr. 922, 925-926.)

**{¶99}** The trial court also defined privilege: "Privilege: That's an immunity, license or right conferred by law, bestowed by express or implicit grant, arising out of status, position, office or relationship, and growing out of necessity." (Trial Tr. 922.)

Case No. 24 BE 0003

**{¶100}** Appellant argues, and we agree, self defense is a privilege as that term is referenced in R.C. 2923.161(A)(1).

**{¶101}** Appellant contends because the jury found he was acting in self defense with regard to the assault on Burch, and since Mrs. House testified the bullets entering her home were a result of Appellant firing his gun, this demonstrates the bullets he shot in self defense were "privileged," The state failed to show he was without privilege when his bullets entered the neighbor's home.

> The doctrine of transferred intent provides that where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting harm is held criminally liable as if he both intended to harm and did harm the same person.

*State v. Campbell*, 2024-Ohio-1693, ¶ 39 (8th Dist.).

**{¶102}** Neither this court nor the Ohio Supreme Court has addressed the issue of whether transferred intent applies to self defense. However, as Appellant contends, the First District Court of Appeals has held one who shoots another, while acting in self defense, is not criminally responsible even when accidentally shooting an innocent third person. *State v. Clifton*, 32 Ohio App.2d 284, 287 (1st Dist. 1972).

**{¶103}** In *Clifton*, the appellate court found the trial court erred by refusing to include an instruction that if the jury found the accused was acting in self defense when he fired the shot that killed the bystander, he would be entitled to acquittal even though the decedent was not the assailant. The *Clifton* Court further held it was "conceivable that from all the evidence and in obeying the instructions of the court the jury believed that defendant did prove self-defense as to [the assailant,] but because of the void in the charge could not find the homicide of [the bystander] to be justifiable." *Id.* It noted this was a case of first impression in Ohio.

**{¶104}** *Clifton* was not reviewing for plain error.

**{¶105}** Other Ohio courts have recognized the doctrine of transferred intent in self-defense cases, but found no error since the jury did not find the defendant was acting in self defense. In *State v. Robinson*, 132 Ohio App.3d 830, 837 (1st Dist. 1999), the First District found the trial court did not err in refusing to give the transferred intent instruction

in conjunction with the self-defense instruction because the evidence did not show the defendant acted in self defense. Thus, there was no prejudice. *Id.*

**{¶106}** In *State v. Vinson*, 2022-Ohio-2031, ¶ 30 (10th Dist.), the appellant claimed the trial court committed plain error when it failed to instruct the jury on the concept of transferred intent in the connection with his claim of self-defense. He argued his intent with regard to the shooting transferred to the accidental victim such that he should have been absolved of criminal liability for accidentally killing a third party when lawfully using force to protect himself.

**{¶107}** The *Vinson* Court held the trial court's failure to include the transferred intent instruction did not affect Mr. Vinson's substantial rights or the outcome of the trial because the jury convicted him of the attempted murder charge, concerning the alleged aggressor, such that the jury did not believe Vinson's claimed self defense. *Id.* at ¶ 40. Thus, the error, if any, in *Vinson* was harmless. *Id.*

**{¶108}** This was the same outcome reached in *State v. Campbell*, 2024-Ohio-1693, ¶ 47 (8th Dist.), which held in part:

> The jury did not find that appellant acted in self-defense against Smith [the aggressor]; as such, it would not have transferred appellant's alleged justification for the shooting of Smith to Townsend and Majid [the unintended victims]. Thus, there was no plain or reversible error in the trial court's failure to instruct the jury on how transferred intent applies to self-defense.

Appellant also directs this court's attention to Judge Painter's dissenting opinion in *State v. Robinson*, *supra*, which states in part:

> The transferred-intent self-defense instruction was necessary for the jury to evaluate [the defendant]'s claim of self-defense as it applied to [the accidental victim]. Without it, the jury was cast at sea with half a compass. Without the requested instruction, the jury easily could have believed that [the defendant]'s intent to kill the robbers could be transferred to prove the intent to kill [the accidental victim], but that he was entitled to defend himself only against the robbers.

Case No. 24 BE 0003

*Id.* at 846 (Painter, J., concurring in part and dissenting in part). As stated, the majority in *Robinson* found the court did not err by failing to provide the transferred-intent self-defense instruction because "the evidence did not support an instruction on self-defense." *Id.* at 584.

**{¶109}** The state, in the case before us, contends this argument does not demonstrate plain error. It emphasizes defense counsel did not request this instruction and failed to raise it to the trial court before or during trial. Moreover, the state urges us to find the court adequately advised the jury that the self-defense claim was raised as to all three offenses such that there was no prejudice, even assuming error.

**{¶110}** Plain error review requires the appellant to show the outcome would have been different absent the error. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

**{¶111}** Arguably, if the instructions were clearer in this regard, the outcome of the trial may have been different. Without a specific advisement as to how the doctrine of self-defense applied to an accidental shooting of a neighbor's home, the jurors, as laypersons, may not have comprehended how Appellant's act of shooting Burch in self defense would have absolved him of the culpability of inadvertently shooting across the street. The jury was "cast at sea with half a compass." The instruction on transferred intent would have added vital clarity.

**{¶112}** Trial courts must give complete and relevant jury instructions on all issues raised by the evidence that are necessary for the jury to perform its duty as the finder of fact. *State v. Comen,* 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. There was explicit case law in Ohio on the argued jury instruction here, and as such, the court would not have had to invent such an instruction.

**{¶113}** The jury was informed Appellant was claiming self defense to all three charges. It was also advised the improperly discharging a firearm into a habitation offense required the state to prove Appellant discharged his firearm into these homes "without privilege to do so." However, the jury was not specifically advised that self defense constitutes a privilege as that term is referenced in R. C. 2923.161(A)(1).

**{¶114}** The jury was likewise not instructed as to how the defense of self defense applied to the discharging of a firearm into a habitation charge when Appellant testified he was defending himself and shooting at Burch in self defense.

**{¶115}** It is difficult to perceive how the jury would have understood and applied these concepts to the improperly discharging a firearm charges absent a specific instruction in this regard. Such an instruction would have given the jury legal guidance as to how shooting at a person believed to be presenting imminent harm to Appellant transferred to real property that did not. Such instruction would have provided the legal link to acquit Appellant if it believed he mistakenly or accidently shot the neighbors' homes while acting in self defense against Burch.

**{¶116}** Unlike the cases in *Robinson*, *Vinson*, and *Campbell*, the jury found Appellant acted in self defense and acquitted him of the felonious assault charge. Consequently, there was more than mere theoretical prejudice in the instant case. We find plain error based on these unique facts. This assigned error has merit.

Inconsistent Verdicts

**{¶117}** Appellant's fourth assigned error asserts:

"The inconsistent jury verdicts in this case are reviewable under the exception set forth in *United States v. Rudolph* [sic], 794 F.3d 602, 608-612 (6th Cir. 2015), and *United States v. Lawrence*, 555 F.3d 254, 263 (6th Cir. 2009), where those verdicts were marked by such inconsistency as to indicate arbitrariness or irrationality such that relief is warranted in the form of a new trial."

**{¶118}** Appellant argues the jury's verdict in count one, acquitting him of felonious assault, is fatally inconsistent with its verdicts on counts two and three, finding him guilty of two counts of improperly discharging a firearm into a habitation. Appellant moved for a new trial based on the alleged inconsistency, which the trial court overruled.

**{¶119}** The state contends Ohio courts generally do not scrutinize different counts of an indictment against one another. It urges us to conclude each count and verdict must be viewed as an independent decision, which are not reviewable when inconsistent with another verdict on another count. The state claims this is consistent with the U.S. Supreme Court's decisions. We agree.

**{¶120}** As the state alleges, the Ohio Supreme Court has held: "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." (Citations omitted.)

*State v. Brown*, 12 Ohio St.3d 147 (1984), syllabus; a*ccord State v. Hicks*, 43 Ohio St.3d 72, 78 (1989).

{¶121}  The Ohio Supreme Court reiterated this conclusion in *State v. Lovejoy,* 79 Ohio St.3d 440, 444 (1997).  "[T]he sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve [an alleged] inconsistency." *Id.*

{¶122}  Further, this district has held, "[t]he possibility of an inconsistency between counts should not be attributed to jury confusion; it is just as likely that the jury entered a judgment of acquittal on one count out of basic leniency."  *State v. Bundy*, 2005-Ohio-3310, ¶ 73 (7th Dist.), citing *State v. Perdue,* 2003-Ohio-3481, ¶ 40 (7th Dist.).  Thus, we did not entertain Bundy's inconsistent verdict argument and found it lacked merit.  *Id.* at ¶ 74.

{¶123}  In *United States v. Randolph*, 794 F.3d 602, 608-612, the United States Court of Appeals for the Sixth Circuit reversed Randolph's conviction.  He argued on appeal his conviction for drug trafficking conspiracy was inconsistent.  The jury found him guilty of the offense, but in the same verdict form, the jury answered "none" to the jury interrogatory asking it to determine the amount or quantity of each type of drug involved. *Id.* at 607.  The Sixth Circuit found the conviction must be reversed since the verdict required the jury to conclude a certain quantity of drugs was involved in the conspiracy. The jury's answer that "none" or no drugs were involved, in addition to a finding of guilt, were fatally inconsistent.

{¶124}  The *Randolph* Court emphasized that the internal conflict in the verdict before it distinguished it from other cases in which juries have rendered separate verdicts to separate crimes or offenses that are inconsistent with one another.  *Id.*

{¶125}  *Randolph* addressed several prior United States Supreme Court cases that rejected inconsistent verdict arguments.  In *Dunn v. United States,* 284 U.S. 390 (1932), *United States v. Powell,* 469 U.S. 57 (1984), and *Harris v. Rivera*, 454 U.S. 339 (1981), the Supreme Court reiterated that it generally does not matter if one verdict is inconsistent with another one.  Instead, separate charges should be reviewed separately since "a verdict may have been the result of compromise, or of a mistake on the part of

the jury," but "verdicts cannot be upset by speculation or inquiry into such matters." *Dunn*, *supra*, at 394.

**{¶126}** Further, the court in *Powell* explained the fact that verdicts are inconsistent does not necessarily mean a windfall for the government. Instead, "the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions." *Id*. at 65.

**{¶127}** *Randolph* stated that the two exceptions to this rule are:

First, where jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality," we have opined that "relief may be warranted." *United States v. Lawrence,* 555 F.3d 254, 263 (6th Cir.2009). Second, in a situation "where a guilty verdict on one count necessarily excludes a finding of guilt on another," i.e. a "mutually exclusive" verdict, this court can review the defendant's challenge to the verdict.

*Randolph*, *supra*, at 610-11.

**{¶128}** As the state points out, however, Ohio and this district have not embraced the arbitrary and irrational exception espoused by Appellant and referred to in *Randolph*. Appellant does not refer this court to any Ohio Supreme Court or Seventh District Court of Appeals decisions applying this exception as referenced by the Sixth Circuit. Regardless, the issue is not reviewable since verdicts cannot be upset by speculation.

**{¶129}** This assigned error lacks merit.

### Sentencing

**{¶130}** Appellant's fifth and final assigned error contends:

"The trial court erred by sentencing Defendant-Appellant to more than the minimum total prison term of five (5) years."

**{¶131}** Because we find Appellant's first and third Assignments of Error have merit, this assigned error is moot.

### Conclusion

**{¶132}** Appellant's first assigned error has merit in part. Appellant's conviction on count two for improperly discharging a firearm into a habitation with a gun specification was supported by sufficient evidence. However, Appellant's conviction on count three, improperly discharging a firearm into a habitation and the attendant firearm specification,

was not supported by sufficient evidence.   As such, the conviction on count three is vacated and not subject to a retrial.

{¶133}  Further, Appellant's assigned error contending plain error has merit.  We reverse and remand for a new trial on count two, pertaining to the house owned by Jessi House, and the attendant firearm specification.

Hanni, J., concurs.

Dickey, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the Appellant's first assigned error has merit in part. Appellant's conviction on count three was not supported by sufficient evidence. Further, Appellant's assigned error contending plain error has merit. We reverse and remand for a new trial on count two pertaining to the house owned by Jessi House, and the attendant firearm specification, according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**