[Cite as *State v. Farmer*, 2025-Ohio-2616.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
JACKSON COUNTY

STATE OF OHIO, : Case No. 24CA4

    Plaintiff-Appellee, :

    v. : <u>DECISION AND
JUDGMENT ENTRY</u>

LARRY E. FARMER :

    **RELEASED 7/22/2025**

    Defendant-Appellant. :

_____

<u>APPEARANCES</u>:

Brian T. Goldberg, Cincinnati, Ohio, for appellant.

Andrea K. Boyd, Special Prosecuting Attorney, Assistant Attorney General, Ohio Attorney General's Office, Columbus, Ohio, for appellee.

_____

Hess, J.

{¶1}    Larry E. Farmer appeals his conviction on improperly discharging a firearm at or into a habitation, with a firearm specification. Farmer contends that the three-year firearm specification must be vacated because the verdict form was defective. He also contends the trial court committed plain error by giving an improper jury instruction on complicity and his trial counsel's failure to object to the jury instruction deprived him of effective assistance of counsel. Farmer also contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Finally, Farmer raises a sentencing error, which the State concedes, in which he contends the trial court failed to provide him with the proper notifications under R.C. 2929.19(B)(2)(c), the Reagan Tokes Law.

**{¶2}** For the following reasons, we overrule Farmer's first through fourth assignments or error and sustain Farmer's fifth assignment of error. We remand the cause for a new sentencing hearing.

## I. FACTS AND PROCEDURAL HISTORY

**{¶3}** The Jackson County grand jury indicted Farmer on one count of attempted aggravated murder and one count of felonious assault, both with firearm specifications, one count of improperly discharging a firearm at or into a habitation, one count of intimidation of attorney, victim or witness in criminal case, and one count of retaliation against a witness. The intimidation and retaliation counts each had firearm specifications. The charges arose out of a dispute over a used Dodge Truck. Farmer pleaded not guilty to all counts. The State filed a superseding indictment that changed the count of attempted aggravated murder under R.C. 2923.01(A) to attempted murder under R.C. 2923.02(A), added "knowingly" to the improperly discharging a firearm at or into a habitation count to accurately track the language in R.C. 2923.161(A)(1), and added a firearm specification to the improperly discharging a firearm count. Farmer pleaded not guilty to the superseding indictment. Prior to trial, the trial court entered a nolle prosequi entry and dismissed the intimidation and retaliation charges; the matter proceeded to trial on the remaining counts.

**{¶4}** At trial, Steven Kisor testified that he knew Larry and Jay Farmer, who were father and son, respectively. Kisor had been working for Larry Farmer's son, Jay, for approximately six to eight months and he also knew Larry because about two months into his employment, he met Larry at Jay's house. Kisor testified that he was renting the trailer where the incident occurred. Both Larry and Jay Farmer came to Kisor's trailer on June

17, 2021. Kisor testified that the Farmers had a dispute with him over a used Dodge Ram truck.

**{¶5}** Kisor was avoiding the Farmers the day they came to see him. Marcus Goheen, his roommate, had knocked on his bedroom door and informed him that two men with guns were there to see him. Kisor had seen the Farmers arrive through a camera he had set up on a phone. Kisor could monitor the phone's camera footage with a tablet. Kisor grabbed a baseball bat and went outside. Larry was walking around outside and Jay was sitting in the truck's passenger seat, pointing a gun at Kisor. Kisor testified that his pickup truck was parked next to the Farmers' truck with the truck bed facing the camera and Larry Farmer's truck was parked with the hood facing the camera. Larry had a gun in his right hand when he first arrived. Kisor testified that he was walking from his bedroom to the front door when Larry handed off his gun to Jay, so Kisor did not see that happen until later when he reviewed the video. Kisor testified that he did not take a gun with him and had no firearms on him when he went outside.

**{¶6}** As Kisor walked between the two trucks, he told Larry "if he grabs that gun, I was going to hit him with a baseball bat." Kisor told them both to leave. Kisor was swinging the bat around in the air. Because Jay Farmer had exited the truck and was standing behind it pointing a gun at Kisor when Larry Farmer came up closer to Kisor and reached for him, Kisor hit Larry with the baseball bat. Kisor testified, "He comes up at me. . . . Because I . . . I put the bat up to keep him out of my . . . my bubble zone and he . . . he reached in to try to grab the bat." After Kisor hit Larry, Jay fired four shots at Kisor, but missed him. At that point, Larry retrieved his gun and had it on him while he continued to pursue Kisor. There is a break in the video recording, during which time Kisor explained

that he was running around the house near the front by the flagpole, which is off camera, and Larry was chasing him. Then Kisor was at the side of the trailer and when Larry came around it, Kisor hit Larry's hand and gun and it made a noise on the video recording. Kisor ran back towards his truck. Jay fired another shot at Kisor and Larry chased him and fired a second shot at Kisor. Kisor then picked up a keg that was in the bed of his truck. Kisor testified that at that point, he had been fired at six times, but he did not run away because he did not want to get shot in the back. Kisor testified that Larry tried to get a second shot off, but his gun jammed and he handed off the gun to Jay.

{¶7}    Kisor testified that one of the bullets hit his truck and put a bullet hole in the hood of the truck. Another bullet hole went through the side of the trailer. Kisor examined enlarged photographs of the video segments which showed blurred images of Kisor when he first came outside. Kisor testified that he had nothing in his hand and was flipping off and pointing at Jay Farmer, "I was flipping them off telling them to get out of there."

{¶8}    The video Kisor captured on his phone was played for the jury. The video shows the front yard and driveway of the residential trailer because the phone camera was recording out a front window of the trailer. Kisor's truck with its bed facing the camera, tailgate down, is on the right side of the screen. Kisor's truck has a beer keg sitting on the end of the truck bed. Approximately three feet behind the truck bed, laying on the ground at the bottom right portion of the scene, appears to be a wooden 4x4 post. Larry and Jay Farmer's truck is facing cab forward and parked next to Kisor's truck approximately ten feet away and on the left side of the screen. The Farmers are sitting inside their truck. Larry gets out of the driver's side of his truck. After Larry gets out of the truck, he takes a gun from his back pocket area with his right hand and then places it back in his back

pocket area. Larry walks to the residence and exits the screen to the left, leaving his driver's side door open. Jay Farmer remained seated in the passenger side of the truck. There are indecipherable voices of several people talking, but no other activity.

{¶9}   Next, Larry enters the left side of the screen, walks to Jay who is sitting in the passenger side of the truck, and hands Jay his gun. Larry exits scene left again and Jay remains seated in the truck. Next Larry and Kisor come walking into the scene together from the left. Jay reaches outside the truck and extends his arm to the front windshield and trains a gun at Kisor as Kisor walks between the Farmer's truck and Kisor's truck. Larry follows behind Kisor. Kisor is carrying a bat in his left hand and raises his right hand and points towards Jay as Kisor walks past the Farmer's truck open driver's side door. Kisor and Larry continue to walk between the trucks and away from the trailer, with Larry following behind Kisor. Kisor twirls and swings a baseball bat in his hand as he walks. Both men stop at the end of the trucks (the bed of Farmer's truck and the cab of Kisor's truck), face each other and argue in an animated manner. Jay Farmer gets out of the passenger side of the truck, walks to the back of their truck and stands behind his father, facing Kisor. While Larry and Kisor argue, Kisor twirls the bat in his hands and Larry steps, extends, and reaches his arm back towards Jay. Kisor is continually retreating and Larry is advancing towards him as the two argue. Larry walks forward towards Kisor, raises his arms, closes the gap between them, and tries to grab Kisor's bat. As that occurs, Kisor takes a swing at Larry, striking him once on the head/neck area. After Kisor swings and hits once, he immediately retreats, taking three to four steps backwards. Jay comes into full view from behind the Farmer's truck bed and advances forward, with his arm fully extended and the gun pointed at Kisor and immediately takes

four shots, which appear to be directed at Kisor. Kisor continues his retreat more quickly to the far side of Kisor's truck and comes up behind it so he is at the open tailgate, and farthest from Jay and Larry.   The only weapon Kisor appears to have in the video is the bat and then later the beer keg. After firing the four shots in quick succession, Jay Farmer retreats to the passenger side of the Farmer's truck and gets into the passenger side again. Larry continues walking between his truck and Kisor's truck towards Kisor, rubbing his neck where he was struck while he resumes his advance towards Kisor.

{¶10}  Footage of the next section is missing. The video starts again with initially only the two trucks in the scene. The wooden 4x4 post no longer appears in the bottom right area of the scene. A few seconds into this segment, Jay Farmer appears from behind the Farmer's truck bed, walking towards the right of the scene carrying a handgun in each hand, and exits the scene on the right. Jay then re-enters the scene from the right, carrying one gun, and turning and looking behind him towards the right as he walks. Jay positions himself between the two trucks and points his gun towards the right of the scene and fires a shot towards the right side of the scene. Jay then positions himself behind the open driver's side door of the Farmer's truck and continues to train his gun towards the right side of the scene.

{¶11}  Kisor is not yet in the scene but Larry has entered the scene from the right, holding a gun in his right hand. Immediately after Jay fires a shot, Kisor runs into the scene from the right and retreats to the rear of his truck. As Kisor runs into the scene, Larry steps forward, raises his arm, takes aim, and fires a shot directly at Kisor, who jumps and dashes behind Kisor's truck. Kisor grabs the beer keg from the bed of his truck and holds up the keg and bat in front of him. Larry advances towards Kisor with his gun trained

on Kisor and appears to try to fire at Kisor while Kisor again attempts to shield himself with the keg. Larry advances close to Kisor and points his gun at Kisor at close range, who stands shielded in part by the keg. Larry then walks around the cab portion of Kisor's truck and towards the Farmer's truck. He hands off his gun to Jay and retrieves a 4x4 wooden post from the ground between the two trucks and advances towards Kisor with the post. Kisor retreats to the right side of the screen and exits the scene. Larry stands at the edge of the right side of the screen, apparently facing Kisor. The beer keg suddenly enters the scene and appears to have been thrown at Larry's feet by Kisor. Larry skips to avoid the beer keg, quickly advances towards Kisor, and moves to the right and out of the scene, carrying the post. Initially only Jay Farmer is left in the scene. He walks from the right side of the scene to the passenger side of his truck and gets in. Larry returns into the scene from the right side, carrying the 4x4 post, and walks to the driver's side of his truck, drops the 4x4 post, gets in, puts the truck in reverse, slowly backs out, and begins to drive away to the left. The Farmers continue to drive slowly away. Kisor does not reenter the scene.

{¶12}  Urias Hall, a deputy sheriff with the Jackson County Sheriff's Office who had been working in law enforcement for 43 years, worked as an evidence technician. He records all evidence into logs and goes to crime scenes and collects and processes evidence. Deputy Hall took photographs at the trailer and placed placards where shell casings were found. Deputy Hall also photographed the bullet hole in the trailer, the bullet hole in Kisor's truck that was parked in front of the trailer, and a wooden beam with blood marks that was lying in the driveway area. Deputy Hall testified that the shell casings were found in front of the trailer in the driveway and yard area. He identified one of shell casings

as "a Win .9 mm" and the other five shell casings as .380 caliber casings. Deputy Hall photographed the bullet hole in the interior of the trailer, in the bedroom drywall, and bullet damage to the window seal, as well as the bullet, which had fallen below. In addition to the number of shell casings found, Deputy Hall recovered two spent bullets from the scene, one from the truck and one from the trailer.

**{¶13}** Chief Deputy Scott Conley of the Jackson County Sheriff's Department testified about the shooting incident that occurred on June 17, 2021 involving Larry and Jay Farmer. He and Lieutenant Zinn were informed by dispatch that there were shots fired at an address in Glenroy, Ohio and they went to the scene. Another deputy had also arrived just prior to Conley and Zinn's arrival. The three of them approached the residence, secured the scene, and spoke to Steven Kisor. After reviewing the video, search warrants were issued for the Farmers. Larry Farmer turned himself in four days later. Conley testified that he knew Kisor because Kisor had been prosecuted for past crimes and had also been retained by law enforcement to work as a confidential informant.

**{¶14}** Lieutenant Rick Zinn of the Jackson County Sheriff's Office testified that he and Chief Deputy Conley responded to the June 17th shooting incident and interviewed Kisor at the trailer. Lt. Zinn had prior involvement with Kisor and knew that he resided at the trailer. When Lt. Zinn first arrived at the scene, Kisor was "very frantic" but they were able to calm him down. Kisor had a video of the incident and Lt. Zinn watched the video and obtained a copy of it that contained the same content as it did when he watched it at the scene. They determined that the suspects in the video were Larry and Jay Farmer. Lt. Zinn also interviewed Kisor about the incident a few days later at the Sheriff's office.

{¶15} The State rested its case and the defense called Larry Farmer.

{¶16} Larry Farmer testified that he became acquainted with Steven Kisor when a dispute over a used Dodge Truck arose. Larry testified that his son Jay and Kisor found a truck online and wanted to purchase it. It was Larry's understanding that Jay bought the truck and it was at Jay's property. After that truck was purchased, Larry and Kisor purchased a second truck for the purpose of using parts from it. Larry testified that he paid for the second truck and Kisor obtained the truck parts. Eventually Larry came to understand that the Dodge Truck had been impounded. Larry testified that he and Jay went to Kisor's trailer to get the keys for the impounded Dodge Truck. Larry believed that Kisor was a violent person, so he decided to take his .9 mm firearm with him when they went to retrieve the keys. However, Larry also testified that he always kept a loaded firearm in his truck.

{¶17} Larry knocked on the trailer door and Marcus Goheen, another resident of the trailer, answered. Larry asked Marcus if Kisor had "any kind of weapons?" and Marcus told him no. Larry testified that upon learning that Kisor was unarmed, Larry put his gun back in the truck. However, when Kisor came out, Larry saw a gun stuck down the front of Kisor's pants. Kisor walked around Farmer's truck and pointed the gun at both Larry and Jay. Then they went to the front of Kisor's truck and Kisor struck him with a baseball bat. After Kisor struck Larry with the bat, Larry walked back to the Farmer truck and Jay handed Larry his gun back. Larry then told Kisor repeatedly to put the bat down, but Kisor did not put the bat down so Larry fired a shot at Kisor, over his left side. Larry testified he was afraid Kisor was going to hit him with the bat a second time so he walked back, got his gun, and approached Kisor. Larry believed that Kisor still had a gun because after he

pointed it at them, he put it in his back pocket. Larry testified that he fired a shot at Kisor "so he'd put the baseball bat down" and to avoid getting hit a second time. After he fired a shot at Kisor's left side, he walked closer to the trailer and Kisor hit him with the bat again. After Larry got hit a second time, he put his gun in the driver's seat of his truck and picked up the 4x4. Larry denied that he tried to shoot Kisor a second time or that his gun had jammed. He refuted Kisor's testimony that he tried to shoot Kisor a second time but the gun jammed, which was why he put it in the truck and picked up the 4x4. Instead, when he points the gun at Kisor a second time in the video, he claims he did not pull the trigger but was just trying to make Kisor put the bat down. Larry picked up the 4x4 but could not hang on to it and dropped it. "Then we heard some sirens and we said, let's get out of here and we took off." He later gave his gun to a friend. Larry testified about two photographs of himself that depicted injuries he sustained from the baseball bat and those were admitted into evidence.

{¶18} On cross-examination, Larry was shown still photos of the video segment that depicted Larry firing shots at Kisor and agreed that his shot at Kisor was accurately depicted by the photos. Larry testified he was just trying to warn Kisor, he was not trying to hit him. Larry testified that his son Jay was already armed. Larry testified that he was angry at Kisor when he went over to Kisor's trailer to get the keys from him. After Kisor came out of the trailer with a bat and a gun, he and Jay did not leave. Larry agrees that before he got hit with the bat, he could have returned to his truck and left. Larry also testified that while Kisor is swinging the bat around to keep Larry back, Larry approached Kisor to grab the bat from him. After Kisor hits Larry, Larry agrees that Kisor retreats. Larry agrees that at that point, he could have gone back to his truck and left.

Q: Okay. And then it's only after he backs away, you reach for the bat that he swings the bat and hits you, correct?
A: Correct.

Q: And that after he's hit you, your son fires four shots, is that right?
A: That sounds right, yes.

* * *

Q: Okay. But your son fires shots and [Kisor] runs away, doesn't he?
A: Yes.

* * *

Q: And so right there at the end, after those four shots, there's nothing stopping you after shots have been fired, there's nothing stopping you and your son from jumping in your truck and driving away, is there?
A: That's correct.

**{¶19}** Larry testified that when they did decide to leave, they just casually walked away, and did not run to the truck, and he even took the time to pick up the 4x4 and put it back. Larry testified that he has not spoken to the friend he gave his gun to since he gave it to her, which was the day of the incident, and he does not know where the gun is now.

**{¶20}** The jury found Farmer not guilty of attempted murder and felonious assault, but guilty of improperly discharging a firearm at or into a habitation. The trial court sentenced Farmer to an indefinite prison term of six to nine years, plus a three-year prison term for the firearm specification, to run consecutively.

## II. ASSIGNMENTS OF ERROR

**{¶21}** Farmer presents five assignments of error:

1. The three-year firearm specification must be vacated, because the verdict form used to convict appellant of the specification was defective.

2. The trial court committed plain error by giving improper jury instructions on complicity.

3. The trial court erred to the prejudice of appellant's Sixth Amendment rights by entering judgment of conviction after a trial at which he received ineffective assistance of counsel for his defense.

4. Appellant's conviction was not supported by sufficient evidence and was contrary to the manifest weight of the evidence.

5. The trial court erred to the prejudice of appellant by failing to comply with the sentencing requirements contained in R.C. 2929.19(B)(2)(c).

## III. LAW AND ANALYSIS

### A. The Firearm Specification Verdict Form

**{¶22}** Farmer contends that there were multiple errors on the verdict form for the firearm specification: (1) it referenced the incorrect Ohio Revised Code section; (2) the specification accompanied an offense that he was not convicted of because the specification verdict form said he was "attempting" to discharge a firearm at or into a habitation, but he was convicted of discharging a firearm, not "attempting" to do so; (3) the verdict form stated that Farmer was guilty of "possessing" a firearm, it did not include a finding that he displayed, brandished, or indicated possession, or that he used it to facilitate the offense; and (4) the most he could have been sentenced to under the verdict form was a one-year firearm specification under R.C. 2941.141, but he was indicted on a three-year firearm specification under R.C. 2941.145.

**{¶23}** The State concedes there were errors in the firearm specification verdict form, but argues that because Farmer did not object at trial, he forfeited all but plain error. Farmer cannot show plain error because he cannot show that but for the error, the outcome at trial would have been different.

### 1. Standard of Review

**{¶24}** Because Farmer did not object to the verdict form at trial, we apply plain-error review.[1] *State v. Rogers*, 2015-Ohio-2459, ¶ 21-22. Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 2014-Ohio-4034, ¶ 16. "An appellate court has discretion to notice plain error and therefore 'is not required to correct it.' " *State v. Jones*, 2020-Ohio-3051, ¶ 17, quoting *Rogers* at ¶ 23. Even if an error is plain and affects a substantial right, we need not correct it. Rather, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Eafford*, 2012-Ohio-2224, ¶ 12.

2. The Incorrect Code Section

**{¶25}** Farmer's indictment included a firearm specification under R.C. 2941.145, which carries a three-year prison term. And the jury instructions followed the firearm specification language in R.C. 2941.145. However, the verdict form cited parenthetically "2941.1410 O.R.C." which is the specification statute governing major drug offenders and has no relevance to this action.

**{¶26}** References to incorrect code sections are not reversible errors because the jury would have no basis to know that it was the wrong section. *State v. Brown*, 2010-Ohio-4453, ¶ 16 (9th Dist.) (finding that the jury would have no reason to know the incorrect code section was referenced and therefore the defendant suffered no prejudice). Therefore, we reject Farmer's argument that his three-year firearm specification must be

---

[1] Farmer raised issues with the verdict form in the trial court six months after the trial, before the sentencing hearing. He did not raise the issue at trial before the verdict forms were submitted to the jury.

reversed merely because the incorrect code section was referenced on the form; he can show no resulting prejudice.

### 3. Errors in the Reference to the Underlying Offense

**{¶27}** Farmer also argues that his conviction for the firearm specification must be reversed because the firearm specification verdict form incorrectly describes the underlying offense to which it attaches – improperly discharging a firearm into a habitation. The form says "attempted to" improperly discharge a firearm. He contends that we must engage in speculation about the offense the firearm attaches to and that the verdict form should not have included the term "attempted" because Farmer was convicted of actually doing it, not just attempting to.

**{¶28}** We find this argument to be without merit. First, the verdict form for the underlying offense of improperly discharging a firearm correctly identifies it as " 'GUILTY' VERDICT FORM FOR COUNT 3 IMPROPERLY DISCHARGING A FIREARM AT OR INTO A HABITATION (2923.161(A)(1))" and accurately identifies the elements of the offense and the correct code section. After the juror signature lines, it contains the instruction "Please move to the next page, the Specification." Therefore, the jury indisputably found Farmer guilty of improperly discharging a firearm at or into a habitation and has determined that a firearm specification applies to that offense. The firearm specification verdict form is labeled "COUNT THREE SPECIFICATION 'GUILTY' VERDICT FORM ON THE SPECIFICATION OF POSSESSING A FIREARM" (but cites the incorrect code section for the major drug offender specification). Therefore, we need not speculate what offense the firearm specification relates to, because it states it relates to "COUNT THREE," which was improperly discharging a firearm into a habitation under

R.C. 2923.161(A)(1). The additional term "attempted," while incorrect, does not invalidate, negate, or confuse the fact that the firearm specification attaches to "COUNT THREE."

### 4. The Verdict Form's Failure to Include the Statutory Language for the Firearm Specification

**{¶29}** Farmer argues that the firearm specification verdict form states only that the jury found Farmer guilty "of possessing a firearm" while committing the offense in Count 3. He argues that this verbiage does not accurately describe either the one-year or the three-year firearm specification. "Possessing" presumably means he could have a firearm back at his residence in another town and not on his person. The State argues that even though the statutory language is not recited verbatim in the verdict form, if we look beyond the verdict forms, "the intended meaning of the jury's verdict is clear." The video showed Farmer with a firearm and Farmer testified he had a firearm and fired it in the direction of the victim while the victim was standing directly in front of the trailer.

**{¶30}** There are several types of firearm specifications. R.C. 2941.141 imposes a one-year mandatory prison term when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense." R.C. 2941.145 imposes a three-year mandatory prison term when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense *and* displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." (Emphasis added.) Farmer was indicted under R.C. 2941.145 and the jury instructions were given which track R.C. 2941.145. However, the verdict form states:

> We, the Jury, being duly impaneled, sworn or affirmed, find the Defendant LARRY E. FARMER "GUILTY" of SPECIFICATION (2941.1410 O.R.C [sic]), of possessing a firearm while attempting to [sic] commit improperly

discharging a firearm at or into a habitation of Steven Kisor in Section 2923.161(A)(1) of the Revised Code and against the peace and dignity of the State of Ohio, a felony of the second degree in the manner and form as he stands charged in the indictment.

**{¶31}** The verdict form does not specifically track the statutory language of either the one-year or the three-year firearm specification, but instead uses the general phrase "possessing a firearm" to describe the firearm specification. However, it identifies the firearm specification as being "in the manner and form as he stands charged in the indictment." The indictment charges Farmer with a three-year firearm specification – both having it on him and displaying it or using it to commit the offense.

**{¶32}** Farmer argues that from the face of the verdict, the only determination the jury made was that Farmer "possessed" a firearm, but there was no jury determination that he had it on his person or under his control while he committed the offense, which would be required for a guilty finding under the one-year specification. And, he argues that there was no jury determination that he had it on his person or under his control *and* that he displayed, brandished, indicated possession, or used it to facilitate the offense, which would be required for a guilty finding under the three-year specification. However, Farmer does not cite any legal authority to support this argument.

**{¶33}** While it would be advisable for the firearm specification verdict form to (1) cite the correct statutory provision for the specification; (2) accurately describe the firearm specification; and (3) accurately describe the underlying offense to which it attaches, we find no plain error because the verdict form refers to the firearm specification as being "in the manner and form as he stands charged in the indictment." The jury instructions included the full explanation of the offenses and the firearm specifications with which Farmer was charged, and a copy of the instructions were given to the jury to refer to

during deliberations. Therefore the firearm specification verdict form fully reflects that the jury found that Farmer possessed a firearm "in the manner and form as he stands charged in the indictment" and they were informed by the trial court in the jury instructions that Farmer was charged with "firearm specifications" and they were to decide whether "the defendant had a firearm on or about his person or under his control while committing the relevant offense and displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate commission of the offense." *State v. Eafford*, 2012-Ohio-2224, ¶ 17-18 (where verdict form used the phrase "possession of drugs . . . as charged in Count 2 of the indictment," the omission of the identity of the drug "cocaine" was not plain error where the jury instructions provided a complete description of the offense and a copy of the jury instructions were given to the jury).

**{¶34}** Farmer also argues that under R.C. 2945.75(A)(2), *State v. McDonald*, 2013-Ohio-5042, and *State v. Pelfry*, 2007-Ohio-256, the conviction for the firearm specification must be vacated because the verdict form here did not include the degree or aggravating element. However, we readily reject Farmer's argument that the firearm specification must be vacated under R.C. 2945.75(A)(2), *McDonald, supra*, and *Pelfry, surpa*. R.C. 2945.75(A)(2) provides:

> (A) When the presence of one or more additional elements makes an offense one of a more serious degree: . . .

> (2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

Because this statutory provision deals with offenses and their degrees, not firearm specifications and their penalties, it does not apply here. *State v. Moore*, 2013-Ohio-4000,

¶ 19 (7th Dist.) (appellate court found that R.C. 2945.75(A)(2) had no application to errors in firearm specifications on verdict forms). "[A] firearm specification is a penalty enhancement, not a criminal offense." *State v. Ford*, 2011-Ohio-765, paragraph one of syllabus (holding that the allied offenses of similar import statute, which incorporates the constitutional protection against double jeopardy, applies to criminal offenses, not penalty enhancements). Because *Pelfrey and McDonald, supra,* interpreted criminal offenses under R.C. 2945.75 and not penalty enhancements provided by specifications, neither of those cases is relevant, nor is the restriction they imposed to look only at the face of the verdict form to determine whether the dictates of R.C. 2945.75 have been followed. *Pelfrey* at ¶ 14; *McDonald* at ¶ 17.

{¶35}   We overrule Farmer's first assignment of error.

B. Jury Instructions on Complicity

{¶36} Farmer contends that the trial court erred when it gave incomplete jury instructions on complicity because it: (1) failed to define the terms "solicited" or "procured," (2) misstated whether the defendant's presence at the scene can prove complicity; and (3) did not provide the requisite mental state to commit a complicity offense. He concedes he did not object at trial and forfeited all but plain error. Thus, we review this under the plain error standard of review. "Plain error exists only where it is clear that the verdict would have been otherwise but for the error." *State v. Skatzes*, 2004-Ohio-6391, ¶ 52.

{¶37} Complicity to commit a crime is prohibited under R.C. 2923.03:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense; . . . .

**{¶38}** The terms "solicit" and "procure" are common terms understood by the average juror and need not be defined for the jury. They are not legal terms with technical meanings, but rather ordinary words in common usage: "solicit" means to seek or ask and "procure" means to get or obtain.

> Terms of common usage need not be defined for the jury. *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 106. "A trial court need not define all terms to a jury; generally, it defines only those 'technical and legal terms which have a meaning not generally understood by the average juror.' " *State v. Caver*, 8th Dist. Cuyahoga No. 91443, 2009-Ohio-1272, 2009 WL 726145, ¶ 84 "[W]hile '[i]t is especially important for courts to define technical terms, * * * courts should limit their definitions where possible to those provided by the legislature to avoid confusion and unnecessary appellate challenges.' " Therefore, "[i]f the term is of general import and common usage, and the term is actually used in that sense, the failure to define it does not mandate a reversal." (Citations omitted.) *State v. Miller*, 2d Dist. Clark No. 2022-CA-58, 2023-Ohio-2508, 2023 WL 4677489, ¶ 80 (finding no error in the trial court's failure to define "safe place unharmed" in kidnapping instruction).

*State v. Colonel*, 2023-Ohio-3945, ¶ 45 (4th Dist.); *State v. Pigg*, 2005-Ohio-2227, ¶ 24 (4th Dist.) (a term of common usage that is used in its ordinary sense does not need to be defined for the jury). Thus, we find no error, plain or otherwise, when the trial court instructed the jury using "solicit" and "procure" without defining them.

**{¶39}** Farmer also argues that the trial court's explanation of the meaning of the defendant's presence at the scene did not track the language in the Ohio Jury Instructions. The Ohio Jury Instructions state, "The mere presence of the defendant at the scene of the offense is not sufficient to prove, in and of itself, that the defendant was an aider and abettor." *Ohio Jury Instructions,* CR § 523.03(A)(8) (Rev. Feb. 6, 2016). The trial court instructed, "In addition, mere presence can be enough if it is intended to and does aid the primary offender."

**{¶40}** The State argues that the exact language the trial court used has been found to be an accurate statement of the law multiple times by other Ohio courts. In *State v. Word*, 2019-Ohio-1733, ¶ 33 (10th Dist.), the court reviewed this specific jury instruction language in a complicity instruction and found that it was accurate:

> This court has recently considered and rejected this same argument. In *State v. Williams*, 10th Dist. No. 15AP-48, 2016-Ohio-4550, we noted that the statement "mere presence can be enough if it is intended to and does aid" the primary offender is an accurate statement of the law that adequately informs the jury that more than mere presence is required to render one an aider and abettor. *Williams* at ¶ 77-81. *See also State v. McDonald-Glasco*, 10th Dist. No.17AP-368 2018-Ohio-1918, ¶ 31-34 (the instruction "mere presence can be enough if it is intended to and does aid the primary offender" is an accurate statement of the law and adequately informs the jury on complicity). Thus, as in *Williams*, we conclude that viewing the instruction as a whole, the trial court properly instructed the jury on complicity and the trial court did not abuse its discretion in denying Word's request for the additional language he sought related to "mere presence."

*Id.* Similarly, we find no error in the trial court's instruction.

**{¶41}** Last, Farmer argues that the trial court failed to instruct the jury on the requisite mental state to commit a complicity offense. The trial court instructed the jury that they must find beyond a reasonable doubt that the defendant was complicit in committing the offense "with the same knowledge or purpose as required by the offense under consideration." Farmer does not contest the jury instruction the trial court gave on the requisite mental state required by the offense under consideration (improperly discharging a firearm at or into a habitation). Rather, he challenges the trial court's failure to repeat the requisite mental state in the complicity instruction.

**{¶42}** We have previously held that where the trial court has defined the requisite mental state in its instruction as to the underlying offense under consideration, the omission of the mental state from the complicity instruction does not constitute plain error.

*State v. Blanton*, 2018-Ohio-1278, ¶ 84 (4th Dist.). The circumstances here are like those in *Blanton.* Just as in *Blanton*, the trial court omitted the requisite mental state from the complicity instruction having already included it the instructions on each of the underlying offenses. Yet, as in *Blanton*, there was an abundance of evidence to support the jury's verdict: surveillance video of Farmer firing the shot, Farmer's admission that he fired his gun to the left of Kisor (the video showed Kisor standing directly in front of the trailer); photographs of the bullet hole in the trailer, and testimony of law enforcement officials who processed the evidence at the scene. We find the incomplete jury instruction did not rise to the level of plain error. Farmer has not demonstrated that the outcome at trial clearly would have been different had the trial court repeated the requisite mental state in the complicity instruction.

**{¶43}** We overrule Farmer's second assignment of error.

### C. Ineffective Assistance of Counsel

**{¶44}** Farmer contends that his trial counsel was ineffective for failing to object to the jury instruction on complicity.

### 1. Standard of Review

**{¶45}** To prevail on an ineffective assistance claim, a defendant must show: "(1) that his counsel's performance fell below an objective standard of reasonableness and (2) that his counsel's deficient performance prejudiced him resulting in a fundamentally unfair or unreliable outcome of the proceeding." *State v. Wilson,* 2024-Ohio-776, ¶26, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed

competent." *State v. Gondor*, 112 Ohio St.3d 377, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *State v. Bailey*, 2023-Ohio-2919, ¶ 10 (4th Dist.).

### 2. Legal Analysis

**{¶46}** We have determined that the trial court did not error in the complicity jury instructions when it: (1) did not define the common terms "solicit" and "procure" and (2) gave the instruction that the defendant's presence "can be enough if it is intended to and does aid the primary offender." Additionally, we found the omission of the requisite mental state did not constitute plain error because Farmer failed to show how the outcome at trial clearly would have been different had the trial court repeated the requisite mental state in the complicity instruction. Therefore, even if we assume for the sake of argument that his trial counsel's representation was deficient, Farmer cannot show prejudice.

**{¶47}** Moreover, Farmer fails to make a clear claim of prejudice in his brief. He contends only that his trial counsel "should have objected to the instruction and requested an instruction more in line with what is laid out by the Ohio Jury Instructions." He makes no assertion that the outcome at trial would have differed. As we determined in our previous analysis, the evidence overwhelmingly supported the jury's verdict against him as the principal offender. Therefore, Farmer has failed to establish his counsel's failure to object to the jury instruction resulted in a fundamentally unfair trial.

**{¶48}** We overrule his third assignment of error.

D. Sufficiency and Manifest Weight

**{¶49}** Farmer contends that his conviction for improperly discharging a firearm into a habitation was not supported by sufficient evidence and was against the manifest weight of the evidence. He argues that the State failed to prove that he did not have a privilege to fire into Kisor's trailer.

1. Standard of Review

a. Sufficiency

**{¶50}** "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell*, 2014-Ohio-1019, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; following *Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Bennington,* 2019-Ohio-4386, ¶ 11 (4th Dist.).

**{¶51}** An appellate court must construe the evidence in a "light most favorable to the prosecution." *State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993). Further, "[t]he court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard*, 2014-Ohio-4974, ¶ 22 (4th Dist.) citing *State v. Kirkland*, 2014-Ohio-1966, ¶ 132; *State v. Lodwick*, 2018-Ohio-3710, ¶ 9 (4th Dist.). Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.' " *State v. Davis*, 2013-Ohio-1504, ¶ 12 (4th Dist.), quoting *State v. Thompkins,* 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). Rather, a reviewing court will not overturn a conviction on a sufficiency of

the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

### b. Manifest Weight

**{¶52}** In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56 (1988), syllabus; *State v. Harvey*, 2022-Ohio-2319, ¶ 24 (4th Dist). Because a trier of fact sees and hears the witnesses, appellate courts will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.); *State v. Colonel*, 2023-Ohio-3945, ¶ 50-54 (4th Dist.).

### 2. Elements of Improperly Discharging Firearm

**{¶53}** Farmer was convicted of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1):

> (A) No person, without privilege to do so, shall knowingly do any of the
> following:
> (1) Discharge a firearm at or into an occupied structure that is a permanent
> or temporary habitation of any individual; . . . .

The term privilege is defined in R.C. 2901.01(A)(12):

(12) "Privilege" means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity.

He argues that the State did not prove beyond a reasonable doubt that he did not have a privilege to fire into the trailer.

**{¶54}** Farmer cites to *State v. Bradley*, 2024-Ohio-5225 (7th Dist.) to support his argument that the State has the burden to prove lack of privilege as an element of the offense:

The phrase "without privilege to do so" is included in the text of the statute as an element of the offense. Contrary to the state's argument, we conclude the legislature's decision to include the words "without the privilege to do so" makes this an element of the offense with the burden on the state. Therefore, the state had the burden to prove Appellant lacked privilege to shoot at or into the neighbors' dwellings.

*Bradley* at ¶ 77. However, the court in *Bradley* also acknowledged that the State can prove this element by circumstantial evidence. *Id.* at ¶ 78. Thus, even though the homeowner in *Bradley* was not asked whether the defendant had permission to fire bullets into her home, the circumstantial evidence was sufficient to prove the defendant did not have a privilege to do so. The homeowner "described being awoken and startled by the sounds of gunshot." Her physical reaction to the gunshots was to run out of her house and throw "her hands up" at the defendant, which showed that she was upset and did not approve of bullets landing in her dining room. The court found this evidence sufficient evidence to sustain this element of the offense. *Id*. at ¶ 81.

**{¶55}** Here the circumstantial evidence was sufficient for the State to prove that Farmer did not have a privilege to fire into Kisor's trailer. First, Kisor testified that Farmer and his son were at the trailer because they had a personal dispute with Kisor about truck

keys. Kisor testified that he did not invite them there, did not welcome them when they arrived, did not want the Farmers on his property, and told them both to leave. Thus, Farmer was not acting out of a right conferred by law or by an express or implied grant of permission from Kisor but acting on his and his son's personal vendetta. Both Kisor's testimony and the video evidence show that Kisor felt threatened by their presence because both men were armed with guns and Jay Farmer had his gun trained on Kisor and had previously fired four shots at him. Kisor's physical movements during the shooting also provide evidence that he did not want Larry Farmer to fire at him or into the trailer. Like the homeowner in *Bradley,* Kisor was visibly startled by the gunshot. He jumps and dashes behind his truck, grabs the beer keg from the bed of his truck, and holds up the keg and bat in front of him as a shield as Larry continues to advance towards him with his gun trained on him. The video evidence of both men's behavior during the shooting provides sufficient evidence that Kisor did not consent to have Farmer fire into his trailer.

{¶56}   Larry Farmer testified that he fired at Kisor to get him to drop the baseball bat.

> A:  And [Kisor] walked to the side and then my son handed . . . handed me my gun and I told [Kisor] to put. . . to put the bat down, put the bat down, put the bat down, I had a gun at that time. And I said "put the bat down" and he wouldn't so I fired over to the left hand side of him from [sic] it was a good ways away from him.

Although Farmer asserted self-defense, it is overwhelmingly evident from the video and Farmer's own testimony that Farmer was not acting in self-defense when he fired into the trailer. Farmer and his son arrived armed and unwelcomed to Kisor's trailer, did not leave when asked, pursued Kisor at gunpoint around the yard, and fired a total of six shots at Kisor, while Kisor was in a continual state of retreat. Farmer repeatedly acknowledged

that at each step during the conflict Farmer could have retreated to his truck and left. Therefore, the State sufficiently disproved self-defense. The jury rejected Farmer's self-defense claim when they found him guilty of improperly discharging a firearm into a habitation. Thus, Farmer had no necessity arising out of self-defense.

{¶57}   We find there was sufficient evidence to support the conviction and the trial court's verdict was not against the manifest weight of the evidence. After viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found Farmer guilty of improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1). And, after our review of the record, and after we consider the evidence and testimony adduced at trial and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence or lack thereof, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice such that Farmer's conviction must be reversed and a new trial ordered.

{¶58}  We overrule Farmer's fourth assignment of error.

E.  Sentencing

{¶59}  For his final assignment of error, Farmer contends that the trial court did not provide him with the notifications required under the Reagan Tokes Law, R.C. 2929.19(B)(2)(c). The State concedes this error and agrees that remand for resentencing is appropriate.

{¶60}  A sentence is contrary to law if a trial court sentences an offender to an indefinite prison term under the Reagan Tokes Law and fails to advise the offender of all the notifications set forth in R.C. 2929.19(B)(2)(c) at the sentencing hearing. *State v. Long*, 2021-Ohio-2672, ¶ 27-29 (4th Dist.). "It is well settled that a sentence that is

contrary to law is plain error and an appellate court may review it for plain error." *State v. Burrell*, 2024-Ohio-638, ¶ 14 (11th Dist.), citing *State v. Efford*, 2023-Ohio-3360, ¶ 18 (8th Dist.).

{¶61} R.C. 2929.19(B)(2)(c) sets out the notifications that are to be provided in accordance with subsections (B)(1) and (2) which mandates that the court notify the offender at the sentencing hearing:

> If the prison term is a non-life felony indefinite prison term, notify the offender of all of the following:
>
> That it is rebuttably presumed that the offender will be released from service of the sentence on the expiration of the minimum prison term imposed as part of the sentence or on the offender's presumptive earned early release date, as defined in section 2967.271 of the Revised Code, whichever is earlier;
>
> That the department of rehabilitation and correction may rebut the presumption described in division (B)(2)(c)(i) of this section if, at a hearing held under section 2967.271 of the Revised Code, the department makes specified determinations regarding the offender's conduct while confined, the offender's rehabilitation, the offender's threat to society, the offender's restrictive housing, if any, while confined, and the offender's security classification;
>
> That if, as described in division (B)(2)(c)(ii) of this section, the department at the hearing makes the specified determinations and rebuts the presumption, the department may maintain the offender's incarceration after the expiration of that minimum term or after that presumptive earned early release date for the length of time the department determines to be reasonable, subject to the limitation specified in section 2967.271 of the Revised Code;
>
> That the department may make the specified determinations and maintain the offender's incarceration under the provisions described in divisions (B)(2)(c)(i) and (ii) of this section more than one time, subject to the limitation specified in section 2967.271 of the Revised Code;
>
> That if the offender has not been released prior to the expiration of the offender's maximum prison term imposed as part of the sentence, the offender must be released upon the expiration of that term.

**{¶62}** The trial court did not provide the notices at the sentencing hearing outlined in R.C. 2929.19(B)(2)(c). Thus, we find that Farmer's sentence was contrary to law. *State v. Price*, 2024-Ohio-1641, ¶ 5-11 (4th Dist.). Farmer is entitled to a new sentencing hearing so that the trial court can give the required instructions.

**{¶63}** We sustain Farmer's fifth assignment of error.

## IV. CONCLUSION

**{¶64}** We overrule the first, second, third, and fourth assignments of error and sustain the fifth assignment of error. We vacate Farmer's sentence and remand for a new sentencing hearing. We affirm the trial court's judgment in part, vacate it in part, and remand for further proceedings consistent with this decision.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART.

CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART, VACATED IN PART AND REMANDED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Jackson County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**